UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CARANDO GOURMET FROZEN FOODS | * | |
| CORP., INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 3:17-cv-30164-ADB |
| | * | |
| AXIS AUTOMATION, LLC and | * | |
| AXIS AUTOMATION GROUP, INC., | * | |
| | * | |
| Defendants. | * | |

**MEMORANDUM AND ORDER
ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

BURROUGHS, D.J.

Plaintiff Carando Gourmet Frozen Foods Corporation ("Carando") brought nine claims

arising from Defendants Axis Automation, LLC and Axis Automation Group, Inc.'s,

(collectively, "Axis"), alleged failure to timely build an integrated pie production line in

violation of their contract. [ECF No. 1]. Axis brought counterclaims against Carando for breach

of contract for Carando's failure to pay for the allegedly defective pie production line. [ECF No.

26]. Currently before the Court is Axis' motion for summary judgment. [ECF No. 69]. For the

following reasons, the motion, [ECF No. 69], is <u>GRANTED</u> in part and <u>DENIED</u> in part.

I.       **BACKGROUND**

A.       **Factual Summary**

Except as otherwise noted, the following facts are not in dispute. On April 28, 2016, the

parties entered into an agreement concerning the purchase of an integrated, automatic pie

production line for $304,200.00 (the "Contract"). [ECF No. 74 ¶ 2; ECF No. 70-2 at 1-6]. Axis

agreed to "provide all controls to allow the system to operate as described" in the Contract and

according to "general specifications" for the construction.  [ECF No. 74 ¶ 6; ECF No. 71 ¶ 6].

The equipment was to be assembled at Axis's facility in Hartland, Wisconsin, and shipped to

Carando's facility in Agawam, Massachusetts following a successful Factory Acceptance Test.

[ECF No. 74 ¶ 7; ECF No. 70 at 3, 19].

According to the Contract specifications, the production line had to be suitable for a

range of five pie shell sizes, from 3.5" to 8.88" in diameter, and able to process three pie shell

sizes at 120 shells per minute and the remaining two shell sizes at 50 shells per minute.  [ECF

No. 70-2 at 2–3].  The Contract required the dough to "release from [the] press by heating the

heads or with air assist."  [Id. at 3].  To ensure that the pie production line could process

Carando's dough, including using heat to release the dough, Carando agreed to "provide

sufficient [dough] product that [would] be run on the system for testing and debugging within 2

weeks of receipt of purchase order.  Delay in receiving product w[ould] delay final delivery."

[Id. at 5].  Axis was to run a Factory Acceptance Test at its facility in Hartland, Wisconsin, and a

Site Acceptance Test at Carando's facility in Massachusetts.  [Id.].  The production line was to

be delivered within twenty-four weeks of Axis' receipt of the purchase order and down payment.

[Id. at 6].

The Contract also included a limited warranty whereby Axis agreed that the pie

production line would be "free from defects in material and workmanship for a period of twelve

(12) months," [id. at 7], which Axis extended to eighteen months, [id. at 6].  Otherwise, the

Contract specified that "[t]his warranty is the sole and exclusive warranty given by Seller to

Buyer.  There are no other warranties of any kind, express or implied, including implied

warranties of merchantability and fitness for a particular purpose."  [Id.].

There is a dispute of fact as to whether the pie production line provided by Axis ever met the specifications in the Contract or passed a Factory Acceptance Test.  [ECF No. 74 ¶ 8]. Carando alleges that the pie production line repeatedly malfunctioned, was unable to process pie shells of the requisite sizes and weight tolerances and failed to process pies at the rates that had been specified in the contract.  [Id.].

On May 24, 2017, Michael and Peter Carando travelled to Axis' facility in Wisconsin to observe a Factory Acceptance Test.  [ECF No. 73 at 6].  The pie production line had not been fully built, could not produce the shells as specified in the contract, and had mechanical failures including a motor failure.  [Id.].  Axis alleges that during subsequent Factory Acceptance Tests in June, July, and August 2017, the pie production line complied with contract requirements. [ECF No. 71 ¶ 11].  Carando maintains that those Factory Acceptance Tests are irrelevant first, because Carando was not present for the tests and, second, because the pie production line was not completed at the time of any such tests.  [ECF No. 74 ¶ 11].  Additionally, Axis employees testified during depositions that the pie production line never had a successful Factory Acceptance Test.  [Id.].

There is also a dispute of fact as to whether the Contract specifically required that the pie production line run on Carando's dough recipe.  [Id. ¶ 14].  Axis argues that it "did not guarantee in the Contract that it would manufacture a pie-line [or turn-key machine] that would make any specific pies, including 'Carando pies' or 'Carando pie crusts.'"  [ECF No. 71 ¶¶ 15–16; ECF No. 74 ¶¶ 15–16].  Axis claims that Carando's dough could not be processed through the pie production line because it could not be released from the machine's press heads with heat or air and instead had to be removed with plastic paper.  [ECF No. 71 ¶¶ 17–18].  Further, Axis maintains that Carando knew at the time that it entered into the Contract that its pie dough could

not be processed with the agreed-upon heated press heads, but did not disclose that its dough could only be removed with plastic until the spring of 2017.  [Id. ¶¶ 19–20].  Carando responds that it had previously used heated heads to release pie dough.  [ECF No. 74 ¶ 18].  More generally, an Axis employee testified that the issue of dough sticking to the heated press heads was a common issue, not specific to Carando's dough.  [ECF No. 73-1 at 257 (explaining that the "issue with dough sticking to the heads on the Carando pie line" is "an issue that every customer faces," such that "every customer . . . for every piece of equipment" had that issue)].  Additionally, Axis' majority owner testified that the production line was in fact able to process smaller pie shells using Carando's pie dough, meaning that the dough could be released from the machine's press heads using air assist.  [ECF No. 75-1 at 284–85].

Finally, there is a factual dispute as to whether Carando ever provided a sufficient dough sample or a dough recipe for Axis to use to test the production line.  Axis alleges that Carando never provided a fresh sample of its dough or a complete recipe.  [ECF No. 71 ¶¶ 21–26].  Axis' expert agrees and concludes that Carando failed to "provide a consistent dough product to work with" or "provide ample supply of such a consistent dough product," which resulted in inconsistent results.  [Id. ¶ 27].  Carando argues that it provided its full confidential dough recipe, including ingredient lists and mixing instructions, as well as premade pie dough on several occasions.  [ECF No. 74 ¶¶ 21–26].

During a Factory Acceptance Test on October 24, 2017, the pie production line could only operate with one pie shell size rather than being able to produce shells of each of the sizes and at the rates specified in the Contract.  [ECF No. 73 at 8].  Both Mike Kiley and Mike Frazier, Axis employees, testified that the Factory Acceptance Test was unsuccessful.  [Id. at 11].

4

Following that failed test, on November 9, 2017, Carando notified Axis that it was terminating the Contract and rejecting the pie production line as non-conforming. [ECF No. 71 ¶ 30]. Carando filed the instant action on that same day. [Id. ¶ 31]. It claims rightful rejection (Count I), breach of contract (Count II), breach of express warranty (Count III), breach of implied warranty of merchantability (Count IV), breach of implied warranty of fitness for a particular purpose (Count V), negligent misrepresentation (Count VI), promissory estoppel (Count VII), and unjust enrichment (Count VIII). [ECF No. 1]. Additionally, it seeks a declaratory judgment that the integrated pie production line did not meet the contract specifications (Count IX). [Id.].

### B.     Procedural History

Carando filed its complaint on November 9, 2017. [ECF No. 1 at 1]. The case was assigned to Judge Mastrioanni. [ECF No. 3]. Axis answered and filed its counterclaim complaint on January 5, 2018, [ECF No. 13], which it amended on September 14, 2018, [ECF No. 26], claiming that Carando breached the contract and seeking damages for the losses sustained as a result of Carando's refusal to accept the pie production line.

Judge Mastrioanni recused himself on September 28, 2018, [ECF No. 29], and the case was assigned to this Court, [ECF No. 30]. Carando filed a motion to amend its complaint on July 31, 2019, [ECF No. 49], which the Court denied on October 22, 2019, [ECF No. 56]. Axis filed its motion for summary judgment on December 4, 2019. [ECF No. 69]. Carando opposed on January 10, 2020, [ECF No. 73], and Axis replied, [ECF No. 76].

## II.    LEGAL STANDARD

Summary judgment is appropriate where the movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  "A fact is material if its resolution might affect the outcome of the case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003). "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id.  When reviewing the record, the court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Id.  The First Circuit has noted that this standard "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and material," Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the court may discount "conclusory allegations, improbable inferences, and unsupported speculation," Cochran, 328 F.3d at 6 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

"To succeed in showing that there is no genuine dispute of material fact," the moving party must point to "specific evidence in the record that would be admissible at trial." Ocasio-Hernandez v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015).  "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. at 4–5 (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).  Once the movant takes the position that the record fails to make out any trial-worthy question of material fact, "it is the burden of the nonmoving party to proffer facts

6

sufficient to rebut the movant's assertions."  Nansamba v. No. Shore Med. Ctr., Inc., 727 F.3d

33, 40 (1st Cir. 2013).

### III.    DISCUSSION

#### A.    Rightful Rejection and Breach of Contract

Axis first argues that the pie production line conformed to the terms of the Contract, such

that Carando's claims for rightful rejection (Count I) and breach of contract (Count II) under

Wis. Stat. §§ 402.601 and 402.602 must fail.  [ECF No. 70 at 10].

In Wisconsin, "[a] complaint states a claim for breach of contract when it alleges: (1) a

contract between the plaintiff and the defendant that creates obligations flowing from the

defendant to the plaintiff; (2) failure of the defendant to do what it undertook to do; and (3)

damages."  Brew City Redevelopment Group, LLC v. The Ferchill Group, 714 N.W.2d 582, 588

(Wis. Ct. App. 2006), aff'd 724 N.W.2d 879 (Wis. 2006) (citing Northwestern Motor Car, Inc. v.

Pope, 187 N.W.2d 200, 203 (Wis. 1971)).  Under Wisconsin's Perfect Tender Rule, a seller in a

single-delivery contract must tender goods to the buyer that fully conform with the parties'

agreement.  Wis. Stat. § 402.601.  If the tendered goods do not conform with the contract, then

the buyer is free to reject them.  Id.

Axis argues that it complied with the requirements of the Contract and that Carando's

rejection of the delivery was therefore inappropriate.  Further, "th[e] term 'Carando pie shells'

appears nowhere in the parties' [C]ontract . . ." and "[u]nder the parties' agreement, Axis did

not—and could not—guarantee that it would manufacture a pie line that would produce any

particular pie shells, including the ill-defined 'Carando pie shells.'"  [ECF No. 70 at 12].  Axis

additionally claims that it could not have made a pie production line specifically for "Carando

pie shells" because Carando did not provide dough ingredients until one week prior to the

October 2017 Factory Acceptance Test and also failed to provide "an experienced dough maker for the [Factory Acceptance Test] at the Axis facility." Id. at 13]. The dough that Carando did produce was allegedly insufficient and Carando never provided a full dough recipe for Axis to produce the dough themselves. [Id.]. Carando, however, maintains that it provided dough on multiple occasions and provided "its confidential and proprietary dough recipe, . . . including its confidential spice packets, ingredient lists and even specific mixing instructions . . . ." [ECF No. 73 at 3].

Carando has submitted sufficient evidence to establish that there is a dispute of material fact that precludes summary judgment on Counts I and II. See American Steel Erectors, Inc. v. Local Union No. 7, Int'l Assoc. of Bridge, Structural, Ornamental, and Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008) ("A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996))). Though the Contract does not specify that Axis deliver a pie production line capable of processing "Carando pies shells," the Contract did explicitly require that the pie production line process a range of five pie shells at specific speeds and weight tolerances. See [ECF No. 70-2]. Based on the evidence submitted to the Court, there is a dispute of fact as to whether Axis ever provided a pie production line that could meet these specifications. More specifically, Carando has provided evidence that during the October 2017 Factory Acceptance Test, the pie production line failed to meet the required specifications. After that failed test, although Axis employees worked to make repairs and modifications to the production line, there remains a material factual dispute as to whether Axis ultimately delivered a pie production line that met the standards required in the Contract. Therefore, summary judgment is DENIED on Counts I and II.

### B.      Expert Testimony

Axis also argues that summary judgment should be granted on Carando's breach of

contract claim (Count II) because Carando has not provided expert testimony concerning

whether the pie production line met the specifications required by the contract.  [ECF No. 70 at

14].  Axis' expert believes that "Axis' machine met standard specifications and . . . Carando

failed to provide a consistent dough product for Axis to work with."  [Id. at 14–15].  Carando

responds that the factual issues in this case, including whether the machine could run the

specified shell sizes or ever passed a Factory Acceptance Test, are not highly technical

determinations that require the assistance of an expert.  [ECF No. 73 at 12-13].

"Expert testimony is required when 'the answers to the highly technical and specialized

questions raised by such claims lie outside the knowledge of most lay jurors.'"  Adelman v. Am.

Honda Motor Co., Inc., No. 12-cv-11051, 2013 WL 6009259, at *3 (D. Mass. Nov. 7, 2013)

(quoting Morse v. Ford Motor Co., No. 08-cv-11930, 2010 WL 2773527, at *1 (D. Mass. July

13, 2010)).  Here, Axis' decision not to secure expert testimony is not fatal to their breach of

contract claim.  Axis employees have testified that the pie production line failed the October

2017 Factory Acceptance Test and also failed to pass any subsequent Factory Acceptance Test.

[ECF No. 75-1 at 252–53].  The pie production line was also allegedly nineteen feet long, rather

than twelve feet as required in the contract.  [Id. at 51].  Though expert testimony may be

beneficial, whether or not the pie production line comported with the Contract specifications or

passed a Factory Acceptance Test are factual questions within the purview of a jury.  See, e.g.,

BASF Corp. v. Sublime Restorations, Inc., 880 F. Supp. 2d 205, 218–19 (D. Mass. 2012)

(denying summary judgment and finding that "a juror, based on his or her common knowledge,"

could decide whether the plaintiff's paint equipment produced mixed paint that matched provided samples).

### C.      Carando's Warranty Claims

#### 1.      Carando's Express Warranty Claim

Axis next argues that summary judgment should be granted on Carando's express warranty claim, (Count III), because the express warranty claim is premised on the same facts as the breach of contract claim, that is the alleged failure to manufacture a pie production line in accordance with the Contract.   [ECF No. 70 at 16].  Carando responds that in addition to the express warranties in the contract, Axis also made express warranties to induce Carando to enter into the Contract.  See [ECF No. 73 at 16 ("While Carando believes the plain language of the Contract is clear in that Axis was to design, build, and deliver a pie line that could produce Carando pie shells, Axis also expressly warranted this fact to induce Carando to purchase the pie line from Axis.")].

As made evident by Carando's pleading, the express warranty claim largely concerns the Contract specifications which will be resolved through the breach of contract claim.  Though Carando may argue that Axis made additional express warranties, it has failed to provide any evidence of those warranties in its pleadings and instead relies on its answer to an interrogatory claiming that "Axis understood that it was to design and build an automated pie line . . . that met Carando's specifications and requirements, and produced Carando pie shells using Carando's pie dough."  [ECF No. 73 at 16 (citing ECF No. 75-1 at 207)]; see also [ECF No. 75-1 at 16 (citing the quoted language as evidence that Axis represented that it understood that it was to design and build a pie production line capable of specifically producing Carando pie shells)].  Such a general claim is insufficient to create a reasonable dispute of material fact.  Because the breach of express warranty claim relies on the same allegations as the breach of contract claim,

summary judgment is <u>GRANTED</u> as to Count III.  <u>See, e.g.</u>, <u>AEP Industries, Inc. v. Thiele Tech.</u>

<u>Inc.</u>, No. 16-cv-00391, 2016 WL 4591902, at *3 (E.D. Wis. Sept. 2, 2016) ("The only breaches

alleged . . . are to express and implied warranties that [the plaintiff] alleges arose out of the

parties' contract.  As a result, [the plaintiff's] breach of contract claim collapses into its breach of

warranty claims."); <u>Rich Prods. Corp. v. Kemutec, Inc.</u>, 66 F. Supp. 2d 937, 983 (E.D. Wis.

1999) ("[Plaintiff] offers no argument that the breach of contract claim is somehow factually

distinct from the breach of warranty claims.  Accordingly, to further clarify and narrow the

relevant issues for trial and avoid jury confusion, [defendant's] motion for summary judgment is

granted with respect to [plaintiff's] breach of contract claim.").

2.  <u>Carando's Implied Warranty Claim</u>

Carando claims that Axis breached its implied warranties of merchantability (Count IV)

and of fitness for a particular purpose (Count V).  Axis replies that the Contract expressly waived

these implied warranties.  [ECF No. 70 at 17].  The Contract included a page titled "**AXIS**

**LIMITED WARRANTY**," which provided that Axis would ensure that the pie production line

was "free from defects in material and workmanship" for eighteen months from the date of

shipment to Carando, but that Axis' "obligation under this Warranty [wa]s limited solely to the

repair or replacement of the Products . . . ."  [ECF No. 70-2 at 6–7].  The Contract specified that

"[t]his warranty is the sole and exclusive warranty given by Seller to Buyer.  There are no other

warranties of any kind, express or implied, including *implied warranties of merchantability and*

*fitness for a particular purpose*."  [<u>Id.</u> (emphasis added)].  Carando does not dispute that the

Contract did in fact include a disclaimer of such implied warranties, but argues that the

disclaimer was inconspicuous and therefore ineffective.  [ECF No. 73 at 15–16].

Under Wis. Stat. § 402.315, "[w]here the seller at the time of contracting has reason to

know any particular purpose for which the goods are required and that the buyer is relying on the

seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified

under s. 402.316 an implied warranty that the goods shall be fit for such purpose." Wis. Stat.

§ 402.315.  Any agreement "to exclude or modify any implied warranty of fitness . . . must be by

a writing and conspicuous." Wis. Stat. § 402.316(2).  See also H.B. Fuller Co. v. Kinetic Sys.,

Inc., 932 F.2d 681, 689 (7th Cir. 1991) ("[T]he Code permits sellers who seek to escape from the

onerous requirements a warranty of fitness for a particular purpose could impose to 'exclude or

modify any implied warranty of fitness' so long as the disclaimer is 'by a writing and

conspicuous.'" (quoting Wis. Stat. § 402.316(2))).  Provided that the disclaimer is in writing,

conspicuous, and "not . . . unconscionable in light of the circumstances at the time the contract

was made," the disclaimer is permissible.  Murray v. Holiday Rambler, Inc., 265 N.W.2d 513,

518 (Wis. 1978) (citing Wis. Stat. § 402.302).  A term is "conspicuous" when it is "so written,

displayed, or presented that a reasonable person against which it is to operate ought to have

noticed it." Wis. Stat. § 401.201(2)(f).  A term might be conspicuous if it has a heading in all

capital letters or contrasting font or is "set off from surrounding text of the same size . . . ." Id.

"Whether a term is 'conspicuous' or not is a decision for the court."  Id.

    Carando argues that the disclaimer was not conspicuous, because it is not in capital,

large, or otherwise contrasting font, or set off with symbols or other marks.  [ECF No. 73 at 15

(citing Wis. Stat. § 401.201)].  The warranty was on its own page and was one page of a ten-page

agreement, marked "**AXIS LIMITED WARRANTY**."  [ECF No. 70-2 at 7].  The Wisconsin

Supreme Court has previously found that contract provisions were conspicuous when they were

located on the back of a one-page contract, under a capitalized, bold heading.  See Deminksy v.

Arlington Plastics Machinery, 657 N.W.2d 411, 423 (Wis. 2003) ("We find that the form and

provisions at issue here satisfy the conspicuousness requirement.  First, the form was one page,

front and back.  This was not an onerous form.  Directly above the space where [the defendant] signed his name was a one-paragraph warning that there were terms and conditions on the back to which the signer would be held. . . .  The paragraph has a heading in capital leaders and bold print . . . .  In addition, on the back of the form at the top of the page is another warning in all capital letters stating that the buyer shall be held to all the included terms and conditions.").

After considering the Contract and the applicable state statutes and case law, the Court finds that the limitation of warranty was sufficiently conspicuous.  See, e.g., Collaran v. Wildes, No. 2015-AP-537, 2016 WL 4195354, at *3 (Wis. Ct. App. 2016) (finding that an indemnity clause was conspicuous when the font of the contract was sufficiently large to be read, the headings of each section were in all capital letters and underlined, and the contract was only ten pages); Fry v. Phillips and Co. Sec., Inc., No. 2012-AP-061, 2012 WL 5500340, at *2 (Wis. Ct. App. 2012) (noting that an arbitration clause was likely sufficiently conspicuous when each section was set forth as an independent section and identified with a number and underlined title); Stenulson v. Hunzinger Const. Co., No. 2007-AP-305, 2007 WL 3254715, at *2 (Wis. Ct. App. 2007) (finding that an indemnification provision was sufficiently conspicuous when the heading was in all capital letters, large font, and bold typeface and that, though every section was similarly formatted, "if the presence of other similar conspicuous type in a contract rendered the indemnification provision inconspicuous, such a standard would preclude parties from making more than one provision of their contract 'conspicuous'").  Summary judgment is therefore GRANTED on Carando's breach of implied warranties claims (Counts IV and V).

### D.  Carando's Negligent Misrepresentation Claim

#### 1.  Choice of Law

The parties dispute whether Carando's negligent misrepresentation claim (Count VI) is governed by Massachusetts or Wisconsin law.  Axis argues that all actions brought under the

Contract are subject to the Contract's choice of law provision which specifies Wisconsin law,

[ECF No. 76 at 7–8], while Carando argues that Massachusetts law governs because the claim is

based on statements made by Axis prior to the parties entering into the Contract, [ECF No. 73 at

17–18].

Because the Court is sitting in diversity in this case, it applies the choice-of-law

provisions of the forum state, Massachusetts.  Mariasch v. Gillette Co., 521 F.3d 68, 71 (1st Cir.

2008); see NPS, LLC v. Ambac. Assur. Corp., 706 F. Supp. 2d 162, 168 (D. Mass. 2010) ("A

federal court sitting in diversity evaluates contractual choice of law provisions according to the

rules of the forum state, here Massachusetts.").  In this case, the contract specified:

> **GOVERNING LAW:**  This Agreement and any transaction between Buyer and
> Seller related thereto shall be governed by, and be subject to, the laws of the State
> of Wisconsin.  Unless otherwise set forth herein, all terms which are defined in the
> Uniform Commercial Code as adopted in the State of Wisconsin shall have the
> same meaning herein as in such code.

[ECF No. 70-2 at 9].  Clearly, the breach of contract and rightful refusal claims need to be

evaluated using Wisconsin law.  Carando argues, however, that its negligent misrepresentation

claim is controlled by Massachusetts law because it is based on statements that Axis made prior

to entering into the Contract to the effect that Axis could immediately start building the pie

production line and that the line could process Carando's dough.  [ECF No. 73 at 18].

"In Massachusetts, a contract's choice of law provision is generally honored, provided

that it does not conflict with public policy."  NPS, LLC, 706 F. Supp. 2d at 168.  That being said,

"[t]he First Circuit has held that claims about the validity of the contract's *formation*, unlike

claims of an alleged breach, are not governed by a choice of law provision."  Id. (emphasis

added) (citing Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co., 986 F.2d

607, 611 (1st Cir. 1993) ("[B]ecause this claim concerns the validity of the *formation* of the

contract, it cannot be categorized as one involving the rights or obligations arising under the contract.  Hence, the claim falls outside the contract's choice-of-law provision.")).  The Court must therefore determine whether Carando's negligent misrepresentation claim pertains to alleged misrepresentations made during the formation of the Contract or in the Contract itself.

Carando alleges that Axis breached its duty of fair dealing "by making false representations to Carando regarding the quality, condition, and merchantability of the integrated pie production line including, but not limited to, representations that the integrated pie production line would be free of defects, would meet the descriptions and specifications in the Contract, and would produce Carando pie shells to specification."  [ECF No. 1 ¶ 93].  Those representations were allegedly false because, "among other things, the integrated pie production line was not manufactured free of defects, did not meet the descriptions and specifications in the contract, and cannot produce Carando pie shells to specifications."  [Id. ¶ 94].  Carando claims that Axis made these false statements "with the purpose of facilitating . . . the sale of the pie production line . . . ."  [Id. ¶ 95].  Therefore, the only alleged misrepresentation that does not explicitly rely on language within the Contract is the statement that the pie production line "would produce Carando pie shells to specification."  Carando alleges that through these words Axis explicitly warranted that the pie production line would process Carando pie dough (though the term does not appear in the contract itself).  [Id. ¶ 93; see also [ECF No. 70-2].

As a preliminary matter, the Court finds that an alleged misrepresentation regarding the pie production line's ability to produce Carando pie shells to specification pertains to misrepresentations made in the Contract itself, because the Contract includes specifications for the pie shells.  [ECF No. 70-2 at 2].  Also, as addressed above, the Contract contemplated that that the pie production line could process Carando pies, even if it does not explicitly include the

words "Carando pies."  Further, Carando has not directed the Court to any evidence to suggest that Axis made materially misleading statements pertaining to Carando's specifications during or prior to the formation of the Contract, beyond the conclusory statement that "[t]he evidence, taken in the light most favorable to Carando, establishes that Axis promised it could immediately start building the pie line and that it would produce pie shells using Carando's dough even though Axis knew these statements to be false."  [ECF No. 73 at 18].  The Contract's choice-of-law provision would therefore govern.

Even if the Court were to consider the dough claim as arising from the formation of the Contract, however, Wisconsin law would govern.  "Massachusetts has adopted a 'functional choice-of-law approach,' which focuses on 'the interests of the parties, the States involved, and the interstate system as a whole.'"  NPS, LLC, 706 F. Supp. 2d at 168 (quoting Bushkin Assocs., Inc. v. Raytheon Co., 473 N.E.2d 662, 668 (Mass. 1985)).  The Court must therefore consider which state has "the most significant relationship to the transaction and the parties . . . ."  Bushkin, 473 N.E.2d at 669.

This case arises from a Massachusetts plaintiff's breach of contract claims brought under the laws of Wisconsin against a Wisconsin defendant for allegedly faulty production of a pie production line in Wisconsin.  The Court is confident that Wisconsin has the more significant relationship to the contractual transaction.  The agreed-upon choice of law provision is further evidence of the parties' acknowledgment of Wisconsin's interest in the case.  Though Carando argues that Massachusetts' choice-of-law rules govern, it makes no argument for the proposition that Massachusetts' substantive law would control the negligent misrepresentation claim.  See [ECF No. 73 at 17–18].

2.  Economic Loss Doctrine

Axis argues that Carando's negligent misrepresentation claim (Count VI) is barred by the economic loss doctrine.  [ECF No. 70 at 18].  The economic loss doctrine "preclud[es] contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship."  Wickenhauser v. Lehtinen, 734 N.W. 2d 855, 868 (Wis. 2007) (quoting Kaloti, 699 N.W.2d at 216).  "Application of the economic loss doctrine to tort actions between commercial parties is generally based on three policies . . . (1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk [of] economic loss, the commercial purchaser, to assume, allocate, or insure against that risk."  Daanen & Janssen, Inc. v. Cedarapids, Inc., 573 N.W.2d 842, 846 (Wis. 1998).  "If claimed damages are the result of disappointed expectations of a bargained-for product's performance, the economic loss doctrine applies to bar the plaintiff's tort claims and the plaintiff must rely upon contractual remedies alone."  Grams v. Milk Prods, Inc., 699 N.W.2d 167, 169 (Wis. 2005).

Wisconsin law provides an exception to the economic loss doctrine for claims that assert fraud in the inducement.  Kaloti Enters. v. Kellog Sales Co., 699 N.W.2d 205, 219 (Wis. 2005).  An intentional misrepresentation is therefore actionable in tort "where the fraud is extraneous to, rather than interwoven with, the contract."  Id. (quoting Digicorp, Inc. v. Ameritech Corp., 662 N.W.2d 652, 662 (Wis. 2003)).  Thus, a claim for fraud in the inducement survives if it concerns "matters whose risk and responsibility did not relate to the quality or the characteristics of the goods for which the parties contracted or otherwise involved performance of the contract."  Id.  "In contrast, the fraudulent inducement exception does not apply where the alleged misrepresentation relates to [the] subject matter of the contract.  In such cases, the parties could

17

have protected themselves through contract negotiations." Kuryakyn Holdings, Inc. v. Abbe,

No. 09-cv-00702, 2013 WL 12234625, at *5 (W.D. Wis. Mar. 4, 2013) (applying Wisconsin law

(citing Below v. Norton, 751 N.W.2d 351, 361 (Wis. 2008))).

As a preliminary matter, Carando has brought a claim for *negligent* misrepresentation,

see [ECF No. 1 ¶¶ 91–98], which lacks the intentionality inherent in a fraud in the inducement

claim.  Further, even if the claimed misrepresentations do not pertain to alleged

misrepresentations within the Contract itself, they all relate to the "quality or the characteristics

of the goods for which the parties contracted," the pie production line, and are therefore not

sufficiently extraneous to the contract to be appropriately brought under a fraud in the

inducement claim.  See, e.g., Principle Solutions, LLC v. Feed.Ing B.V., No. 13-cv-00223, 2014

WL 4954465, at *9 (E.D. Wis. Sept. 30, 2014) (applying Kaloti and finding that the defendant's

"alleged intent not to perform according to the terms of the contract [wa]s not extraneous to the

contract").  Such misrepresentations are barred by the economic loss doctrine because they "are

either: (1) expressly dealt with in the contract's terms, or (2) if they are not dealt with explicitly

in the contract's terms, they go to reasonable expectations of the parties to the risk of loss in the

event the goods purchased did not meet the purchaser's expectations . . . ." Kaloti, 669 N.W.3d

at 219.  Therefore, Carando's negligent misrepresentation claim is barred under Wisconsin's

economic loss doctrine and summary judgment is GRANTED on Count VI.

### E.    Promissory Estoppel and Unjust Enrichment

Carando additionally seeks to recover under two equitable theories: promissory estoppel

and unjust enrichment.  [ECF No. 1 ¶¶ 99–108].

Promissory estoppel allows a plaintiff to recover when he has reasonably relied on a

defendant's promise.  "The doctrine . . .  provides an alternative basis to consideration for

treating a promise as a contractual undertaking.  When applicable, which [is] to say when the promise is definite enough to induce a reasonable person to rely, the doctrine makes the promise enforceable."  All-Tech Telecom, Inc. v. Amway Corp., 174 F.3d 862, 868 (7th Cir. 1999) (internal citations omitted) (applying Wisconsin law).  Promissory estoppel "is meant for cases in which a promise, not being supported by consideration, would be unenforceable under conventional principles of contract law."  Id. at 869; see Bertha v. Remy Int'l, Inc., 414 F. Supp. 2d 869, 881 (E.D. Wis. 2006) ("Although parties may present alternative and mutually exclusive claims in a complaint, the promissory estoppel claim would be alternative and mutually exclusive only if it alleged . . . that no contract existed.  The incorporation of the allegation that an agreement exists means that [the plaintiff] can have no promissory estoppel claim.").

Similarly, the doctrine of unjust enrichment, which prevents a party from receiving a benefit without paying for it, "does not apply where the parties have entered into a contract." Greenlee v. Rainbow Auction/Realty Co., 553 N.W.2d 257, 265 (Wis. Ct. App. 1996); see also Carroll v. Stryker Corp., 658 F.3d 675, 682 (7th Cir. 2011) (applying Wisconsin law and explaining that "[w]here there is an enforceable contract, the proper claim is for breach of contract; quantum meruit and unjust enrichment are unavailable").  Carando argues that, despite the existence of a valid and binding contract with Axis Automation, LLC, its promissory estoppel and unjust enrichment claims should be permitted because there is a dispute of fact regarding whether Defendant Axis Automation Group, Inc. is a party to the Contract.  [ECF No. 73 at 19].

"[I]t is well-established that a plaintiff may file a complaint based on an express or implied contract theory and alternatively on a quasi-contract or unjust enrichment theory.  It is only if the unjust enrichment claim incorporates by reference allegations of the existence of a

contract between the parties, that a court will dismiss the unjust enrichment claim." <u>NC</u>

<u>Holdings v. United Rehabilitation Servs., Inc.</u>, No. 06-cv-01085, 2007 WL 542140, at *7 (E.D.

Wis. Feb. 16, 2007) (internal citations omitted).  Carando is correct that it was permitted to seek

equitable relief as an alternative to a contract claim.  <u>See</u> Fed. R. Civ. P. 8(d)(2) ("A party may

set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a

single count or defense or in separate ones.  If a party makes alternative statements, the pleading

is sufficient if any one of them is sufficient.").

In this case, however, the promissory estoppel and unjust enrichment claims clearly rely

on the Contract and incorporate it by reference.  Carando alleges that "Axis made clear and

definite representations and promises to Carando in regards to the integrated pie production line

and its ability to manufacturer [sic] the integrated pie production line *in accordance with*

*Contract specifications*."  [ECF No. 1 ¶ 100 (emphasis added)].  Carando further claims that it

then "justifiably relied on Axis' representations and promises to its detriment by . . . agreeing to

purchase the integrated pie production line and making payments to *Axis pursuant to the*

*Contract*."  [<u>Id.</u> ¶ 102 (emphasis added)]; <u>see also</u> [<u>id.</u> ¶ 105 ("Carando conferred a benefit on

Axis by, among other things, contracting to purchase the integrated pie production line from

Axis.")].

Even if the equitable claims did not incorporate the Contract by reference, however,

Carando has not put forth any evidence concerning the relationship between Axis Automation,

LLC, and Axis Automation Group, Inc.  <u>See, e.g.</u>, [ECF No. 73 at 20 ("In a case such as this,

alternate pleading allows a plaintiff's case to proceed in the face of uncertainty as to the

existence of a contract, or uncertainty as to whether a particular defendant or issue falls within

the ambit of [a] contract that otherwise exits [sic].")].  Though Carando was permitted to plead in

the alternative at the outset, such unsupported allegations are insufficient to survive a motion for summary judgment.  Summary judgment is therefore <u>GRANTED</u> as to Carando's claims of promissory estoppel (Count VII) and unjust enrichment (Count VIII)

### F.    Declaratory Relief

Lastly, Carando seeks declaratory relief establishing that the integrated pie production line did not meet the Contract specifications.  [ECF No. 1 ¶ 111].  Axis argues that Carando's request for declaratory relief is duplicative of its other claims.  [ECF No. 70 at 23 (quoting <u>House of Brides, Inc. v. Alfred Angelo, Inc.</u>, 163 F. Supp. 3d 534, 547 (N.D. Ill. 2016)) ("Courts commonly decline to exercise their discretion when 'the claim for declaratory judgment substantially overlaps with [a party's] substantive claims.'")].

Under Federal Rule of Civil Procedure 57, "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."  Fed. R. Civ. P. 57. "[T]he existence of another adequate remedy may be a factor bearing on the appropriateness of declaratory relief . . . ."  <u>Western Elec. Co. v. Hammond</u>, 135 F.2d 283, 287 (1st Cir. 1943). Courts may therefore "exercise[] their discretion to refuse to entertain a declaratory judgment claim where its only purpose is to resolve an already-existing breach of contract claim."  <u>Cliffs Mining Co. v. Wis. Electric Power Co.</u>, No. 18-cv-00581, 2018 WL 6181470, at * 6 (E.D. Wis. Nov. 27, 2018).  Here, as an exercise of its discretion, the Court declines to hear the declaratory judgment claim.  The issues raised by the declaratory judgment issue will be adequately resolved through the surviving breach of contract claims.  Summary judgment is therefore <u>GRANTED</u> as to Count IX.

IV.     **CONCLUSION**

Accordingly, for the reasons set forth herein, the motion for summary judgment, [ECF No. 69], is <u>GRANTED</u> in part and <u>DENIED</u> in part.  Specifically, summary judgment is granted against Carando on its claims for breach of express and implied warranties (Counts III, IV, and V), negligent misrepresentation (Count VI), promissory estoppel (Count VII), and unjust enrichment (Count VIII), as well as Carando's request for declaratory relief (Count IX). Summary judgment is denied as to Carando's rightful refusal (Count I) and breach of contract (Count II) claims, which will proceed to trial.

**SO ORDERED.**

May 4, 2020                                                    /s/ Allison D. Burroughs
                                                              ALLISON D. BURROUGHS
                                                              U.S. DISTRICT JUDGE